**ReCON PAVING, INC., Appellant,**

**v.**

**The UNITED STATES, Appellee.**

**Appeal No. 84–642.**

United States Court of Appeals, Federal Circuit.

Oct. 3, 1984.

Robert D. Vetra, Mount Holly, N.J., argued for appellant.

Richard W. Oehler, Washington, D.C., argued for appellee. With him on the brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Stephen G. Anderson, Washington, D.C.

Before RICH, BALDWIN and MILLER, Circuit Judges.

JACK R. MILLER, Circuit Judge.

This appeal arises under a contract, subject to the Contract Disputes Act of 1978 (41 U.S.C. §§ 601–613) ("CDA"), for repair of a runway at McGuire Air Force Base, New Jersey. It presents two questions: (1) whether appellant, ReCon Paving, Inc. ("ReCon") is entitled to recover interest under section 12 of the CDA (41 U.S.C. § 611) for the period of delay in payment prior to June 25, 1982; and (2) whether ReCon was entitled to a negotiated contract price increase (paid by the Government) reflecting interest for the period June 25 to September 15, 1982.[1] The Armed Services Board of Contract Appeals ("board") held that there were no such entitlements and granted the Government's motion for summary judgment. We affirm in part and reverse in part.

### Background

Prior to the contract award on July 21, 1981, a meeting was held on July 15 to clarify certain matters at ReCon's request. One of ReCon's concerns was that there would be a substantial cost overrun for the quantity of hot asphalt required. ReCon was assured that, if this were the case, appropriate revisions and funding provisions would be made. At a preconstruction conference on July 29, the overrun question was again raised by ReCon and again responded to by statements that, if ReCon's suppositions were correct, appropriate provision would be made. On October 16, 1981, ReCon submitted a current estimate reporting that nearly all of the quantity of asphalt called for by the contract had been used and that the runway was still not close to completion. However, ReCon was assured that the asphalt cost overrun would present no problem and that ar-

---

1. As will appear below, the distinction between an entitlement to interest and an entitlement to a negotiated contract price increase is crit-ical—a point apparently overlooked by both parties and the board.

rangements had already been made for the additional funding required.

ReCon completed the contract satisfactorily in November 1981 and then wrote to the contracting officer regarding compensation for the asphalt cost overrun. It was orally advised that, in view of the extent of the overrun, it should submit a contract pricing proposal for the excess asphalt used. A representative of the procurement office supplied a DD Form 633 (Department of Defense Contract Pricing Proposal) for this purpose. On December 15, 1981, ReCon's president wrote the contracting officer objecting to the Government's requirement for renegotiation of the entire contract and pointing out that ReCon's interest cost had varied from 16 to 22 percent during the past year. He added:

> I understand we would also be eligible for some interest on any unpaid balances during the administrative process involved, even though that interest would in no way adequately compensate us for our interest cost.

Pursuant to the contracting officer's instructions on or about December 21, 1981, ReCon, on January 14, 1982, submitted the completed DD Form 633 in the amount of $1,319,560.55, which represented an increase of $378,370.97 over the original contract price. In the cover letter, ReCon's president stated:

> As you are aware, prime interest rates are very high these days and since we timely completed this project on or about November 10th, 1981, and interest is running, we would like to be paid as soon as possible.

On March 8, 1982, ReCon's president submitted more information requested by the contracting officer and wrote:

> Based on your estimate today of mid-April at the earliest, for a resolution of these matters I wish to point out that whatever additional payment I receive will be eroded by the 10% interest cost I have sustained during the six months awaiting payment.

On April 20, 1982, the contracting officer responded as follows:

> We will not be prepared to negotiate any increases in price for added work units for 3–4 more weeks. Once we have finished our analysis of your request, Hq MAC will have to review the work. Processing payment will take an additional two or 3 weeks after negotiations.

Actual negotiations between the parties did not begin until May 18, 1982, when the Government offered ReCon $1,282,800. ReCon did not find this satisfactory, considering its post-audit request for $1,349,684 and, one day later, requested a final determination from the contracting officer "so that we may proceed with the necessary appeal process." On June 4, the contracting officer responded that internal processing of the final decision would take two to three weeks, "perhaps longer." On June 7, ReCon submitted a revised DD Form 633 "[i]n accordance with our meeting of Thursday, June 3rd, 1982." This reflected higher cost and overhead figures determined by the Defense Department auditor and advanced a total contract price of $1,443,575.

On June 22, 1982, the contracting officer responded that ReCon's "revised claim" conflicted with the action being taken on his final decision; that the "revised claim" would have to be sent to DCAA for review; and that he could "give no estimate of time frame in handling the revised claim." At that point, before issuance of any final decision by the contracting officer, the parties settled, as evidenced by the following note, dated June 24, 1982, from the contracting officer to ReCon:

> This confirms our negotiations of a total contract price of $1,290,000 ... (net increase of $348,810.42). This amount is for work performed and does not consider interest whether payable or not.

On the same day, ReCon sent confirmation to the contracting officer that it was seeking interest on the portion of the contract price unpaid between January 14, 1982 (date of submission of first DD Form 633) and "such time as payment is made." Also on the same date, ReCon provided a

"Certificate of Current Cost or Pricing Data," as follows:

CERTIFICATE OF CURRENT COST OR PRICING DATA

CONTRACT # F28609–81–C–0032
McGuire Air Force Base
Repair Runway 18–36

This is to certify that to the best of my knowledge and belief, cost or pricing data as defined in ASPR 3–807.1(a)(1) submitted, either actually or by specific indentification [*sic*] in writing (see ASPR 3–807.3(a)) to the Contracting Officer or his representative in support of Contract # F28609–81–C–0032 claim dated January 14, 1982 are accurate, complete and current as of January 14, 1982.

This certification includes the cost or pricing data supporting any advance agreement(s) and forward pricing rate agreements between the offeror and the Government which are part of the proposal.

FIRM: ReCon Paving, Inc.

NAME: Alton W. Cross, Jr.

TITLE: President

DATE OF EXECUTION: June 24, 1982 *

* Pricing data submitted and executed January 14, 1982. This certification withheld until June 24, 1982 in accordance with instruction as per DAC # 76–18, 3–807.6(a) Pages 3:126 and 3:127 as provided by McGuire Air Force Base Procurement Office for this purpose.

On August 13, 1982, the contracting officer notified ReCon that, when making final payment under the contract, he would issue two separate modifications—the first for $348,811, the difference between the basic contract price and the "negotiated settlement." Interest would be handled under a separate instrument "payable at 14.75% from 25 Jun through 30 Jun and 15.5% from 1 Jul until paid." On September 9, the contracting officer sent ReCon, for ReCon's signature and return, a supplemental agreement P00001 reflecting an increase of $348,810.42 on the contract. However, the contracting officer stated that the modification would not be binding until approved by Hq MAC and, further, that "[f]unds are not yet available to recover this modification." In signing the document, ReCon released the Government from any and all liability for further equitable adjustments "except as to matters of interest pertaining to the net increase."

On September 23, 1982, ReCon notified the contracting officer that it intended to claim payment for interest on $352,063.70 (the fourth payment on the contract) running from October 23, 1981 (date payment was due) to September 15, 1982 (payment made September 14). ReCon also requested a final decision from the contracting officer as quickly as possible and "immediate payment of any interest which you do determine is due, so that our appeal may be limited to the amount, if any, in actual dispute."

On October 7, 1982, the contracting officer issued a *contract price Modification* P00002 reflecting interest from June 25 to September 15 in the amount of $12,251.37, as follows:

a. By modifying the contract price to read "one million three hundred two thousand two hundred fifty one dollars and thirty seven cents" in lieu of "one million two hundred ninety thousand dollars and no cents" [a difference of $12,251.37].

b. Interest payment for periods 25 June 82 to 30 June 82 at the rate of 14.75% and 1 July 82 to 15 Sep 82 at the rate of 15.5% a total of 77 days.

c. This Change Order does not constitute final settlement of the contractor's claim of interest and does not preclude disputing the balance period of 14 Jan 82 through 24 June 82 pursuant to the contract disputes clause.

d. Payment of the above amount is without prejudice to the rights of either party.

REASON FOR MOD: Payment of Interest
PERFORMANCE PERIOD: Unchanged
CONTRACT PRICE: Increase $12,251.37

On November 23, the contracting officer issued a final decision stating that "[t]he interest paid [under Modification P00002, running from June 24, 1982] is correct and

proper." However, interest for the period prior to June 25, 1982 was denied on the ground that a "claim" on which interest was payable came into existence only with the receipt of the Certificate of Current Cost or Pricing Data on June 25, quoting from Defense Acquisition Regulation ("DAR") 1–314 entitled "Disputes and Appeals," as follows:

(a) *General.* The Contract Disputes Act of 1978 (Public Law 95–563, 41 U.S.C. 601–613) establishes procedures and requirements for asserting and resolving claims by or against contractors relating to a contract subject to the Act. In addition, the Act provides for the payment of interest on contractor claims, for the certification of contract claims in excess of $50,000, and a civil penalty for contractor claims that are fraudulent or based on a misrepresentation of fact.

(b) *Definition.*

(1) As used herein, "claim" means a written demand on one of the contracting parties seeking, as a matter of right, the payment of money, adjustment or interpretation of contract terms, or other relief, arising under or related to the contract. However, a written demand by the contractor seeking the payment of money in excess of $50,000 is not a claim unless or until certified as required by (L) below.

(2) A voucher, invoice or other routine request for payment ... not in dispute when submitted is not a claim for the purposes of the Act. However, where such submission is subsequently disputed either as to liability or amount or not acted upon in a reasonable time, it may be converted to a claim under Section 6(a) of the Act as provided in (h) below.

(h) *Initiation of a Claim.* Contractor claims shall be made in writing and submitted to the contracting officer for a decision.

(L) *Certification of Contractor Claims over $50,000.*

(1) Section 6(c)(1) of the Act requires that a contractor claim over $50,000 shall be certified at the time of submission that it is made in good faith; that the supporting data are accurate and complete to the best of the contractor's knowledge and belief; and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

The contracting officer concluded that ReCon's request for payment of money dated January 14, 1982 (the first DD Form 633), was "not a claim based upon DAR 1–314(b)(2)," but that "the amount negotiated to settle the claim on June 24 became a claim" when ReCon's Certificate of Current Cost on Pricing Data was received on June 25, citing DAR 1–314(b)(1) and (L).

On December 3, 1982, ReCon filed its notice of intent to appeal with the board, including in its letter the following remarks:

We found it particularly disturbing that no consideration was given to the sequence of events or the numerous errors and misrepresentation by the government which created the entire situation surrounding this "claim", which in essence, was no more than payment for services and materials provided in accordance with prices and conditions established by a contract entered into as a result of competitive bidding.

\* \* \* \* \* \*

On January 15, 1982 we submitted the only document ever requested or submitted relative to the amount still due on this contract. On June 24, 1982, negotiations were completed based on the document submitted, which by that time had been wholly supported by a Defense Department audit, and simultaneously we were advised that certification would be required, which was provided on the document given to us at that time.

There is nothing in the law which in any way stipulates that the certification is required before negotiations; Sec. 6.(c) [of the CDA] merely states that it will be required, and it obviously was provided when it was requested.

\* \* \* \* \* \*

Our determination to proceed with this matter is further reinforced by the fact that all of the problems involved were created by a combination of the following conditions:

1) An initial design error by government engineers.

2) A refusal by government officials to recognize this error when it would have been correctable without adversely impacting the quality of the project or the price established.

3) Misrepresentation by government officials as to the availability of funds to cover the increased quantities at the time the initial contract values had been committed, but prior to placement of the overrun quantities.

4) Failure of government officials to initially advise us this matter was being treated as a *"claim"* under the *"disputes"* provisions of the law, not merely as a required audit and pricing verification necessitated by the fact that the quantity changes exceeded permissable limits on individual items and the gross overrun value exceeded $100,000 which appears to be some internal magic number with the Air Force.

5) During the whole torturous [*sic* tortuous] process of audit and, nothing being accomplished, in repeated discussions with various government officials involved, no mention was ever made tieing [*sic*] the *"certification"* to *"eligibility"* for interest.

It would be quite possible to conclude from the sequence of events that we were deliberately trapped into providing goods and services for which the funds never were available and then entrapped into providing a no-interest loan while awaiting the availability of funds....

### The Board

The board, with one member dissenting, issued its opinion (*ReCon Paving, Inc.*, ASBCA No. 27836, 83–2 ¶ 16,658) granting the Government's motion for summary judgment. It concluded that, since ReCon had never provided a certified claim with its January 14, 1982, or subsequent pricing proposals, as required by section 6(c)(1) of the CDA, ReCon's "interest claim" was unallowable as a matter of law, because there was no underlying claim to which interest could attach. Accordingly, it held that the contracting officer had correctly denied ReCon interest running prior to June 25, 1982. The board stated that—

regardless how appellant's proposal or request for equitable adjustment is characterized, without proper certification it cannot serve as basis for interest payment pursuant to Section 12 of the Act. Moreover, the failure of the contracting officer or other Government officials to designate appellant's pricing proposal as a claim and to demand certification cannot modify or negate the statutory certification requirement.

Further, the board reversed the contracting officer's allowance of interest for the period from June 25 to September 15, 1982, in the amount of $12,251.37, which had already been paid by the Government pursuant to Modification P00002, because ReCon's Certification of Current Cost or Pricing Data of June 25 did not satisfy all three of the certification requirements of section 6(c)(1) of the CDA[2] and, therefore, could not transform ReCon's pricing proposal into a "claim" within the meaning of sec-

---

**2.** Section 6(c) (41 U.S.C. § 605(c)) provides:
(c) Amount of claim; certification; notification; time of issuance; presumption
  (1) A contracting officer shall issue a decision on any submitted claim of $50,000 or less within sixty days from his receipt of a written request from the contractor that a decision be rendered within that period. For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.
  (2) A contracting officer shall, within sixty days of receipt of a submitted certified claim over $50,000—
    (A) issue a decision; or
    (B) notify the contractor of the time within which a decision will be issued.

tion 6(a) of the CDA. The board declared that it was not sufficient to make "implicit" representations of "good faith" (a statement required for certification) either in other statements in the purported certification or in the supporting data, as suggested by the dissenting member. Finally, the board observed that a contracting officer has no authority to either waive or modify the statutory requirements for certification, and that an estoppel would not lie against the Government because the contracting officer had acted on an uncertified claim or had failed to request certification.

### Discussion

■ As to ReCon's claim for interest for the period prior to June 25, 1982, ReCon's "Certificate of Current Cost or Pricing Data" does not meet the requirements of Section 6(c) (41 U.S.C. § 605(c)), 32 C.F.R. 57 (¶ 7–103.12) (June 1980), so that it could not support an allowance for interest. *See Essex Electro Engineers, Inc. v. United States*, 702 F.2d 998 (Fed.Cir.1983); *Fidelity Construction Co. v. United States*, 700 F.2d 1379, 1384 (Fed.Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983).

■ ReCon's requests for equitable adjustments for asphalt overruns and interest were settled (except for interest claimed for prior to June 25, 1982) through negotiations with the contracting officer by Modifications (P00001 and P00002) to the contract price itself. Thus, interest of $12,251.37 for the period June 25 to September 15, 1982, was subsumed in the increased contract price provided for by Modification P00002, agreed to and paid by the Government. We are satisfied that such action was within the contracting officer's settlement authority. Accordingly, we hold that the board erred in effectively deciding that ReCon was not entitled to the negotiated contract price increase provided by Modification P00002.

The Government argued at oral hearing that *Nab-Lord Associates v. United States*, 682 F.2d 940, 230 Ct.Cl. 694 (1982) and *Brookfield Construction Co. v. United States*, 661 F.2d 159, 228 Ct.Cl. 551 (1981) establish that, for purposes of the CDA and the issue of whether interest is payable, the word "claim" is a term of art referring only to the underlying claim—here the $348,810.42 equitable adjustment; and, therefore, that the only relevant question is whether ReCon certified this underlying claim in excess of $50,000 in order to entitle ReCon to interest under the CDA.

This argument, along with the Government's citation to *Fidelity Construction Co. v. United States, supra*, and *Essex Electro Engineers, Inc. v. United States*, 702 F.2d 998 (Fed.Cir.1983), fails to take into account the unique factual situation before us involving a negotiated contract price increase arrived at through settlement authority of the contracting officer. This is not to say that a contracting officer has authority to allow interest, as such, on a claim that has not been certified as required by 41 U.S.C. § 605(c). It is to say that a contracting officer, in negotiating a claim for damages by the contractor, may reach a settlement on the increase in contract price which is mutually satisfactory. That the amount of the increase happens to reflect a portion of the interest (i.e., only for the period June 25 to September 15, 1982) demanded by the contractor, does not render the government's payment a payment of interest. Thus, contract price Modification P00002 issued by the contracting officer provides:

CONTRACT PRICE:           Increase $12,251.37

■ A contracting officer has broad authority in negotiating a settlement of contract disputes. *See* McBride, Wachtel, Touhey, GOVERNMENT CONTRACTS § 5.40 (1984); Nash, *Government Contract Claims* 141 (1981), citing FPR 1–2.-406–4. *See also Cannon Construction Co. v. United States*, 319 F.2d 173, 177–80, 162 Ct.Cl. 94 (1963), where the United States Court of Claims said:

Significantly, plaintiffs have cited us no cases where this court has invalidated, on the ground of lack of authority,

any agreement made by the contracting officer in the settlement of a claim for damages for breach of contract. On the contrary, we have held on numerous occasions that compromise settlements were valid and binding on both parties. 319 F.2d at 179 (footnote omitted).

Our decision here is consistent with the basic purposes of the interest provision of the CDA, which is plainly remedial in nature. One of the reasons Congress enacted section 12 (41 U.S.C. § 611)[2] was that it recognized that the cost of money (usually referred to as interest) necessary to finance additional or disputed work while pursuing an administrative remedy is a legitimate cost for which the contractor should be compensated. *Brookfield,* 661 F.2d at 170. The interest provision was also designed to serve as a monetary incentive to the contracting officer to expedite consideration of requests for payment by contractors thereby providing additional inducement for the settlement of claims short of litigation.[3] *Fidelity Construction Co. v. United States, supra; Brookfield,* 661 F.2d at 164.

### *Summary*

In view of the foregoing, we affirm the board's grant of summary judgment with respect to of ReCon's "claim" for interest for the period prior to June 25, 1982, and reverse the board's grant of summary judgment as to the negotiated contract price increase provided by price Modification P00002.

AFFIRMED–IN–PART; REVERSED–IN–PART.

BALDWIN, Circuit Judge, dissenting in part.

I agree with the majority's decision to reverse the board's grant of summary judgment as to the contract price modification P00002 which reflects interest on the amount due to ReCon for the period June 25, 1982 to September 15, 1982.

I dissent from the majority's decision that ReCon is not entitled to interest for the period January 14, 1982 to June 24, 1982. For the same reasons which I stated in my dissents in *Fidelity Construction Co. v. United States,* 700 F.2d 1379, 1388 (Fed.Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983), and *Essex Electro Engineers, Inc. v. United States,* 702 F.2d 998, 1005 (Fed.Cir.1983), a contractor is entitled to the interest authorized by 41 U.S.C. § 611 (1982) from the date the contracting officer receives a claim pursuant to 41 U.S.C. § 605(a) until the date of payment—regardless of whether the claim is certified under section 605(c).

On January 14, 1982, ReCon submitted, as the Department of the Air Force requested, a Department of Defense Contract Pricing Proposal (DD Form 633). This submission constituted a claim within the meaning of section 605(a), entitling ReCon

2. This provides as follows:
    Interest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim pursuant to section 605(a) of this title from the contractor until payment thereof. The interest provided for in this section shall be paid at the rate established by the Secretary of the Treasury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board.

3. S.Rep. No. 95–1118, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Ad.News 5235, 5267, reads in pertinent part:
    One of the Commission's [Commission on Government Procurement] primary objectives was to induce more resolution of disputes by negotiation and settlement. Requiring the agencies to shoulder the responsibility for interest and payment of judgments brings to bear on them the only real incentives available to induce more management involvement in contract administration and dispute resolution. Either the agencies must use some part of their program funds to pay the interest and the judgment, or they must seek additional funds from Congress for this purpose. The former course can have an impact on current programs; the latter would necessitate an explanation to a congressional committee. While these are negative incentives, they offer some counterpart to the economic considerations a contractor must evaluate in deciding whether to settle a claim or to litigate.

to interest pursuant to section 611 on amounts found due ReCon.

The inevitable result of the majority following *Fidelity Construction*'s statutory interpretation is that ReCon does not receive the interest it is justly due.